# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2021AP1732-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin,<br>    Plaintiff-Respondent-Petitioner,<br>  v.<br>Eric J. Debrow,<br>    Defendant-Appellant. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 404 Wis. 2d 511, 979 N.W.2d 817
(2022 – unpublished)

| | |
|---|---|
| OPINION FILED: | June 23, 2023 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 17, 2023 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Dane |
|   JUDGE: | John D. Hyland |

JUSTICES:
KAROFSKY, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ANN WALSH BRADLEY, DALLET, and HAGEDORN, JJ., joined. ROGGENSACK, J., filed a concurring opinion in which REBECCA GRASSL BRADLEY, J., joined.

NOT PARTICIPATING:

ATTORNEYS:

For the plaintiff-respondent-petitioner, there were briefs filed by *John A. Blimling,* assistant attorney general, with whom on the briefs was *Joshua L. Kaul,* attorney general. There was an oral argument by *John A. Blimling,* assistant attorney general.

For the defendant-appellant, there were briefs filed by *Megan Lyneis,* assistant state public defender. There was an oral argument by *Megan Lyneis,* assistant state public defender.

**2023 WI 54**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.  2021AP1732-CR
(L.C. No.  2018CF202)

STATE OF WISCONSIN　　　　　　　　　　:　　　　IN SUPREME COURT

State of Wisconsin,

　　　　Plaintiff-Respondent-Petitioner,

　　v.

Eric J. Debrow,

　　　　Defendant-Appellant.

**FILED**

**JUN 23, 2023**

Samuel A. Christensen
Clerk of Supreme Court

KAROFSKY, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ANN WALSH BRADLEY, DALLET, and HAGEDORN, JJ., joined. ROGGENSACK, J., filed a concurring opinion in which REBECCA GRASSL BRADLEY, J., joined.

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1　JILL J. KAROFSKY, J.　Here we are asked to decide whether the circuit court[1] erroneously exercised its discretion when it denied Eric J. Debrow's motion for a mistrial after a witness, who was testifying about his suspicion of Debrow,

---

[1] The Honorable John D. Hyland of the Dane County Circuit Court presided.

stated that he "looked on CCAP."[2]  Debrow believed this testimony implicated his prior sexual assault conviction, which the circuit court had already ruled inadmissible.  The court of appeals held that the circuit court erroneously exercised its discretion and reversed Debrow's conviction.  The State seeks review of the court of appeals' decision.  We conclude that the circuit court did not erroneously exercise its discretion when it denied Debrow's request for a mistrial.  Therefore, we reverse the court of appeals' decision and affirm the judgment of conviction.

## I.  BACKGROUND

¶2    Debrow was charged with second-degree sexual assault of a child under the age of 16 as a persistent repeater[3] after Mary,[4] his girlfriend's daughter, reported that Debrow sexually assaulted her in January 2018.  Later, Debrow was additionally charged with first-degree sexual assault of a child under the age of 13[5] for the sexual assault of Nancy, Mary's sister.  The cases were consolidated for trial.

---

[2] CCAP, which stands for Consolidated Court Automation Programs, makes certain information about circuit court and appellate court cases available to the public.

[3] See Wis. Stat. §§ 948.02(2) & 939.62(2m)(2017-18).

[4] To protect the privacy and dignity of the victims in this case, we refer to them using pseudonyms.  Wis. Stat. § 809.86 (2021-22).

[5] See Wis. Stat. § 948.02(1)(e) (2017-18).

¶3 Prior to trial, Debrow sought to exclude evidence of his 2004 child sexual assault conviction on the grounds that its probative value was substantially outweighed by the danger of unfair prejudice. The State agreed, and the circuit court granted Debrow's motion to exclude the evidence.

¶4 At trial, the State first called Mary, who testified that Debrow was her mother's boyfriend and lived with the family in January 2018. She reported that she awoke early in the morning on January 17, 2018 to a person "touching [her] butt and thigh," and that she was "100 percent" sure that person was Debrow. Mary testified that she screamed, the dogs in the house started barking, and Debrow left her room.

¶5 When asked whether she had awoken to Debrow in her room before, Mary testified that she had once woken up to Debrow sitting on her bed, at which point Debrow told her, "shh, it's just a game," and directed her not to tell her mother. Mary also testified that she had a conversation with her mother about what to do if "anything were to happen" in her room in the middle of the night, and that "the general consensus was that I would scream."

¶6 The State then called its second witness—Isaac, Mary's brother. Isaac testified that as he was lying awake in bed on January 17th, he saw Debrow enter Mary's bedroom. Five to ten minutes later, Isaac heard his sister scream and saw Debrow exit the room immediately after. Isaac testified that he "had the feeling of something that was going on" and that he called the police after he got home from school that same day.

¶7 During Isaac's redirect examination, the State requested a sidebar. During the sidebar, the State sought to ask Isaac leading questions about why he thought "something strange was going on inside of [Mary's] room." The State explained that it wanted to rebut the idea that Isaac was "jumping to conclusions based on absolutely nothing." According to the State, Isaac knew about Debrow's prior conviction, but he would avoid discussing it in accordance with the court's ruling. Instead, Isaac would testify as to why he was vigilant about Debrow and his sisters. Debrow's counsel expressed concern that the proposed line of questioning would elicit inadmissible evidence concerning the 2004 conviction and indicated that he would move for a mistrial if Isaac gave "the wrong answer." The court said it would allow the State to pursue its proposed line of questioning "in not a directly leading fashion but in a very direct or indirect but not leading manner." The court also noted that it would be "on pins and needles as well to jump in" if Isaac began to reference the prior conviction.

¶8 Soon after the State's redirect of Isaac resumed, the following exchange occurred:

> [Prosecutor]: . . . At any point . . . had you learned anything or heard anything that led you to be on alert that night on January 17th of 2018?
>
> [Isaac]: Yes.
>
> Q And were those based on things your sisters had mentioned?
>
> A No.

4

Q Are those things that you heard from your mom?

A It's things that I --

Q -- I don't want to get into that --

(Unreportable simultaneous interjections by Counsel.)

. . . .

[Defense]: -- Objection, Your Honor. Objection, move to strike. Another motion in a minute.

THE COURT: I'll -- I'll move to strike. The question was were those things you heard from your mother, and if you can just give yes or no . . . . We can't get into what they are, because that's hearsay.

[Isaac]: Well, my mom did tell me --

THE COURT: -- all right, that's fine. That's all . . . We can't -- we can't put her words into your mouth in front of the jury. That's why she's a witness if she testifies.

[Prosecutor]: Your Honor, I have no further questions.

The court then addressed the jury and gave the following curative instruction:

THE COURT: . . . And -- and to the extent that -- as the State was -- was raising an interjection the answer beyond what he gave just now will be -- I'll direct the jury to strike anything else that they -- they heard beyond the witness's statement that he heard from his mother but not the content of anything.

¶9 After this exchange, the jury was excused, and the parties met to discuss Isaac's testimony. Although the court reporter was unable to record Isaac's response to the State's question about why he was on alert, the parties and the court agreed that he said, "I looked on CCAP."

¶10 Debrow moved for a mistrial on the grounds that Isaac's statement was inadmissible as it pertained to Debrow's

5

prior sexual assault conviction. More specifically, Debrow argued that the jury would assume that Isaac's reference to CCAP meant that Isaac had learned about Debrow's criminal record and that "it's going to be an easy assumption and leap to the idea that -- that what he found on CCAP was a sexual assault." Debrow argued that no curative instruction would be adequate to remedy the situation because the jury is "not going to unlearn what they learned." In response, the State argued that the jury may not have heard the reference to CCAP over the interjection by the court and the attorneys, that the State had attempted to characterize the problem as a hearsay issue to draw the jury's attention away from the substance of the statement, and that a curative instruction would be "probably the most drastic thing that is necessary."

¶11 The circuit court denied the motion for mistrial. It explained that the jury may not be familiar with CCAP, saying "to them, it might mean nothing," and emphasized that Isaac did not say what he found on CCAP. The court continued "if any juror is thinking to themselves, well, I know on CCAP you can find out about any public court record, then they may be presuming criminal, they may be presuming small claims, they may be presuming civil, whatever -- divorce, whatever." The circuit court concluded that "on this record with that minimal bit of information that the jury picked up upon if they were listening carefully . . . certainly doesn't say for example, well, I knew he had a prior conviction, I knew he had done this before."

6

¶12 The circuit court further mentioned that the jury's attention was quickly directed to a possible hearsay issue rather than the substance of Isaac's statement, saying: "it was stopped based upon people pointing out that you can't get into hearsay, and not saying you can't say that, you can't say that part, but just -- but directing it towards a hearsay that can't be brought before the jury."  Finally, the circuit court then discussed available remedies, saying "we're open to striking, I already told them to strike anything, we're open to giving the instruction on striking, we're open to curative instructions that don't redirect their attention to it two days from now."

¶13 The trial proceeded to its conclusion, and Debrow did not renew his motion for mistrial.  Debrow requested the standard jury instruction regarding stricken testimony at the close of trial, which was given, but he did not request any additional jury instructions specifically related to Isaac's testimony.  The jury convicted Debrow of second-degree sexual assault of Mary and acquitted him of the charges related to Nancy.  Consistent with the persistent repeater enhancer, the court sentenced Debrow to life imprisonment without the possibility of extended supervision.

¶14 Debrow appealed the circuit court's denial of his mistrial motion.  In granting Debrow's request for a new trial, the court of appeals held that the circuit court's attempt at a curative instruction for Isaac's statement regarding CCAP was insufficient and therefore that "the circuit court erroneously exercised its discretion in denying Debrow's motion for

7

mistrial." State v. Debrow, No. 2021AP1732-CR, unpublished slip op., ¶36 (Wis. Ct. App. July 21, 2022). We granted the State's petition for review and reverse the court of appeals' decision.

## II. ANALYSIS

¶15 When faced with a motion for mistrial, "the circuit court must decide, in light of the entire facts and circumstances, whether . . . the claimed error is sufficiently prejudicial to warrant a mistrial." State v. Ford, 2007 WI 138, ¶29, 306 Wis. 2d 1, 742 N.W.2d 61. We review a circuit court's decision to grant or deny a motion for mistrial for an erroneous exercise of discretion. Id. "An erroneous exercise of discretion may arise from an error in law or from the failure of the circuit court to base its decisions on the facts in the record." Id., ¶28 (quoting State v. Raye, 2005 WI 68, ¶16, 281 Wis. 2d 339, 697 N.W.2d 407). "Discretion is not synonymous with decision-making. Rather, the term contemplates a process of reasoning." State v. Gallion, 2004 WI 42, ¶3, 270 Wis. 2d 535, 678 N.W.2d 197 (quoting McCleary v. State, 49 Wis. 2d 263, 277, 182 N.W.2d 512 (1971)).

¶16 Here, the circuit court did not erroneously exercise its discretion when it determined, in light of the facts and circumstances of the case, that Isaac's statement regarding CCAP was not so prejudicial as to warrant a mistrial. Before the circuit court denied Debrow's mistrial motion, it first considered arguments and counterarguments from both parties, allowing each attorney ample time to make their case outside the presence of the jury. The circuit court then considered the

8

possible extent of prejudice to the defendant. In finding the error was not sufficiently prejudicial to warrant a mistrial, the court highlighted two things. First, it was not reasonable to assume that Isaac's statement regarding CCAP would lead a juror to infer that Debrow had a prior sexual assault conviction. Second, Isaac's statement was mitigated when the circuit court immediately struck the testimony and drew the jury's attention away from the substance of Isaac's statement and towards a hearsay issue.

¶17 The circuit court also considered the various alternatives to what it correctly deemed the "most serious of remedies," a mistrial. It concluded that striking the testimony was appropriate, which it had already done. The circuit court also invited the defense to request an appropriate jury instruction. However, the defense requested only the standard jury instruction regarding stricken testimony at the close of trial.

¶18 All of this evinces an appropriate process of reasoning. The circuit court considered the facts and circumstances in the record, heard arguments from both parties, assessed available remedies, and concluded that the error was not so prejudicial as to warrant a mistrial. No error of law is evident. As such, we conclude that the circuit court properly exercised its discretion in denying Debrow's request for mistrial.

¶19 The court of appeals reached a different result and erroneously focused on the sufficiency of the court's curative

9

instruction to "strike anything else that they [the jury] -- they heard beyond the witness's statement that he heard from his mother but not the content of anything," rather than whether the circuit court erroneously exercised its discretion in denying Debrow's mistrial motion. See Debrow, No. 2021AP1732-CR, at ¶36 (Wis. Ct. App. July 21, 2022) ("The court's attempts to cure the prejudicial effect of this testimony were insufficient and did not properly instruct the jury to disregard that testimony when deliberating."). The question of whether the court erroneously exercised its discretion in denying the mistrial is separate from the question of whether its instruction actually cured the error. Debrow challenged the court's decision to deny a mistrial. He did not alternatively challenge the adequacy of the court's curative instruction, so that issue is not before us today.

### III.   CONCLUSION

¶20 The circuit court did not erroneously exercise its discretion in denying Debrow's mistrial motion. It considered the facts and circumstances of the case, heard arguments from both sides, considered alternative remedies, and determined that the error was not so prejudicial as to warrant a mistrial. Accordingly, the court of appeals' decision is reversed.

*By the Court.*—The decision of the court of appeals is reversed.

10

¶21 PATIENCE DRAKE ROGGENSACK, J. (*concurring*). A jury convicted Eric J. Debrow of second-degree sexual assault of a child under the age of 16 at the conclusion of a three-day trial.[1] Debrow moved for a mistrial following the second witness's testimony, which the circuit court denied. The court of appeals reversed and ordered a new trial, concluding that the jury instruction given was insufficient to address the prejudice caused by the second witness's statement.[2]

¶22 I conclude that the circuit court did not erroneously exercise its discretion in denying Debrow's mistrial motion when reviewed in light of the entire trial, including the sufficiency of the jury instruction. Accordingly, I would reverse the court of appeals decision and conclude that Debrow is not entitled to a new trial.

¶23 I concur in the result reached by the majority opinion, but I do not join the opinion. It lacks a full analysis of the entire proceeding, which is necessary in addressing the court of appeals' reversal of the circuit court.

## I. BACKGROUND

¶24 On January 17, 2018, officers from the City of Madison Police Department responded to Debrow's residence to investigate the sexual assault of a child that Debrow reportedly committed earlier that day. At the time of his arrest, Debrow resided

---

[1] The Honorable John D. Hyland of the Dane County Circuit Court presided.

[2] State v. Debrow, No. 2021AP1732-CR, unpublished slip op., ¶4 (Wis. Ct. App. July 21, 2022).

with his girlfriend, Kathy,[3] and her three children: Isaac, 17; Mary, 13; and Nancy, 11.

¶25 Debrow was charged with second-degree sexual assault of a child under the age of 16 based on the report that he had touched Mary's buttocks in the early morning. See Wis. Stat. § 948.02(2). Due to a prior 2004 conviction for child sexual assault, Debrow also was charged as a persistent repeater pursuant to Wis. Stat. § 939.62(2m)(a) and (b), which imposes a mandatory sentence of life imprisonment without possibility of parole. The State later charged Debrow in a separate case with first-degree sexual assault of a child under the age of 13 as a persistent repeater contrary to §§ 948.02(1)(e) and 939.62(2m)(a) and (b) for sexual assault of Nancy. The two cases were consolidated for trial.[4] Debrow pled not guilty to all charges.

¶26 The circuit court ruled on a number of motions in limine prior to the jury trial. Relevant to our review, the court granted Debrow's motion to exclude evidence of his 2004 conviction of child sexual assault on grounds that the

---

[3] I use pseudonyms for the victims and their family members in this case pursuant to Wis. Stat. § 950.04(dr) and § (Rule) 809.86 (2021-22). For consistency, I use the same pseudonyms the parties used before this court.

All subsequent references to the Wisconsin Statutes are to the 2021-22 version unless otherwise indicated.

[4] Because Debrow challenges his conviction on charges relevant to Mary alone, I do not address the merits or evidence related to Debrow's charges related to Nancy.

conviction was more prejudicial than probative. The State agreed the conviction was "too prejudicial."

¶27 Trial commenced, and Mary was the first witness. She testified that Debrow came into the bedroom she shared with Nancy early one morning. Mary disclosed that she woke to Debrow massaging or gripping her buttocks over her clothes, and that he rubbed her thighs as she slept on her stomach. Mary stated she screamed at Debrow to get out "numerous times at the top of [her] lungs," and the dogs started barking. After she screamed, Debrow stopped touching her and left her bedroom. She explained she knew Debrow rather than Isaac was the person in her bedroom because of identifiable physical differences between the two men.

¶28 Mary also testified that on an earlier occasion she woke to find Debrow sitting on her bed, and Debrow said, "[S]hh, it's just a game . . . you don't have to tell your mom about it." She did not tell her mom that Debrow was in her bedroom that first time. However, based on conversations with her mother, Mary testified that she was instructed to scream "if anything were to happen" in her bedroom. The defense cross-examined Mary about interviews she gave as part of the investigation, and she admitted that she had told Debrow many times that she "did not like him." Mary stated that she did not want to be thinking about Debrow touching her.

¶29 Isaac testified next. Although Isaac knew Debrow had been convicted of child sexual assault in 2004, Isaac also was aware that he could not testify about Debrow's prior conviction

"unless and until" the court allowed the prosecutor to bring it up. Isaac testified he lay awake in bed early one morning with his bedroom door open, and he saw Debrow enter the girls' room. Five to ten minutes later, Isaac heard Mary repeatedly scream "get out," the dogs began to bark, and Isaac saw Debrow leave his sisters' bedroom.

¶30 Isaac testified that he called the police later that afternoon to report Debrow, even though he did not hear anything from the room besides Mary yelling "get out," and his sisters did not mention anything to him. Isaac stated he "wanted to call the police the whole day when [he] was at school" and that he "had the feeling of something that was going on." Isaac said that when he got home from school he told his mom and Debrow that he was going to call police, and Debrow told him not to call the police. Isaac testified that Debrow was like "a father figure until all this stuff happened," after which Isaac did not like Debrow anymore. Isaac stated he and Debrow had gotten into physical altercations on six occasions.

¶31 During Isaac's re-direct, the State requested a sidebar in which it expressed its desire to provide the jury an explanation for why Isaac thought "something strange was going on inside of [his sisters'] room," and why he later called the police; the prosecution wanted to show that Isaac did not "jump[] to conclusions based on absolutely nothing."

¶32 Subsequent to a lengthy sidebar, in which Debrow contended the State's proposed inquiry would surely bring out "evidence that had already been ruled inadmissible," the court

4

allowed the State to pursue its proposed line of questioning "in a very direct or indirect but not leading manner." The court noted the State should be cautious, and that it would sustain any defense objections because the defense already opposed the line of questioning. The court stated it would be on "pins and needles [and would] jump in" if Isaac started to testify about the 2004 conviction. The defense made its intent clear to move for a mistrial if Isaac gave the "wrong answer."

¶33 After three questions, defense counsel objected:

[Prosecutor]: . . . At any point . . . had you learned anything or heard anything that led you to be on alert that night on January 17th of 2018?

[Isaac]: Yes.

Q And were those based on things your sisters had mentioned?

A No.

Q Are those things that you heard from your mom?

A It's things that I --

Q -- I don't want to get into that --

(Unreportable simultaneous interjections by Counsel.)

. . . .

[Defense]: -- Objection, Your Honor. Objection, move to strike. Another motion in a minute.

THE COURT: I'll – I'll move to strike.

. . . .

[Isaac]: Well, my mom did tell me --

THE COURT: -- all right, that's fine. That's all.

5

. . . .

We can't -- we can't put her words into your mouth in front of the jury. That's why she's a witness if she testifies.

. . . .

[Prosecutor]: Your Honor, I have no further questions.

THE COURT: . . . And -- and to the extent that -- as the State was -- was raising an interjection the answer beyond what he gave just now will be -- I'll direct the jury to strike anything else that they -- they heard beyond the witness's statement that he heard from his mother but not the content of anything.

The jury was excused for the day.

¶34 Outside the presence of the jury, the parties discussed what occurred. Although the court reporter did not catch what Isaac said, the parties agreed they heard Isaac say "I looked on CCAP," which is the Consolidated Court Automation Programs. Among other things, CCAP enables the public to access some information about circuit court and appellate cases. The court stated "the jury couldn't possibly have heard anything else."

¶35 Debrow moved for a mistrial. He argued that the jury would assume Isaac found information about a prior sexual assault on CCAP, and that the assumption would be so "damaging" that "there's no way around it," the jury cannot "unlearn what they learned." Debrow asserted striking the statement or a curative instruction would be insufficient to remedy Isaac's statement.

¶36 The State argued that it was hard to know "what, if any, of that the jury could have heard and made out."

6

Accordingly, the State's position was that the statement did not require a mistrial or even a curative instruction; striking the statement would sufficiently cure any error.

¶37 Following a lengthy colloquy in which both parties developed their positions, the court acknowledged that mistrial is "the most serious of remedies." In initially denying Debrow's motion for mistrial, the circuit court placed its reasons for denial on the record, which I discuss below. The court stated that, upon Debrow's request, it was "open to giving the instruction on striking" and "open to curative instructions that don't redirect [the jury's] attention to it two days from now."

¶38 The trial proceeded for two more days, during which Nancy, Kathy, two officers, and two detectives testified for the State. Nancy testified that on January 17, 2018, her sister woke her up because she screamed "get out," and Nancy saw a "shadow go outside the room and the door closed." Nancy identified the shadow as Debrow because of physical differences between Debrow and Isaac.

¶39 Kathy testified she had a "ground rule" that the boys and girls were not allowed in each others' bedrooms, and Kathy instructed the girls to be loud enough to "wake all of Madison up" if something were to happen. The State read and published to the jury text messages between Kathy and Debrow. The State also played a recorded phone call Debrow made to Kathy from jail. In both the text messages and the phone call, Kathy confronted Debrow about a pornographic video he had watched, the

7

graphic title of which implied a stepfather sexually abusing a stepdaughter while his wife was asleep.

¶40 An officer testified he informed Debrow of probable cause to charge him with second-degree sexual assault of a child as he arrested Debrow. Debrow asked the officer why it "had to be second-degree . . . and not just fourth degree sexual assault," which the officer clarified for the jury is a misdemeanor involving nonconsensual sexual contact between adults.

¶41 A detective testified that she knew Mary from occasions prior to Debrow's arrest, and that she responded to the apartment on January 17, 2018. The detective stated that once Mary recognized her, Mary "put[] her head in [the detective's] chest and cried for about a minute-and-a-half." Another detective testified that the girls each had a Safe Harbor interview.[5]

¶42 Debrow did not testify, and the defense did not call any witnesses. Debrow did not renew his motion for mistrial at the circuit court; however, he appealed contending that the circuit court erroneously exercised its discretion in denying his motion for mistrial. The defense also did not challenge or request a specially drafted jury instruction related to Isaac's testimony. The jury convicted Debrow of second-degree sexual

---

[5] Safe Harbor is a child advocacy center that provides for the forensic interviewing of children who are victims of sexual and physical abuse. Safe Harbor forensic interviews are video-recorded for court use, though children are still required to testify.

assault of Mary, but acquitted him for the charges related to Nancy. Consistent with the persistent repeater enhancer, the court sentenced Debrow to life imprisonment without the possibility of parole.

¶43 Relevant to our review, the court of appeals concluded Isaac's statement, "I looked on CCAP," was unfairly prejudicial to Debrow, and that the court's instruction relevant to Isaac's testimony was insufficient. It therefore concluded that "the circuit court erroneously exercised its discretion in denying Debrow's motion for a mistrial."[6] The court of appeals granted Debrow a new trial. The State petitioned us for review.

## II. DISCUSSION

### A. Standard of Review

¶44 "A motion for mistrial is committed to the sound discretion of the circuit court." State v. Ford, 2007 WI 138, ¶28, 306 Wis. 2d 1, 742 N.W.2d 61. In ruling on a motion for mistrial, a circuit court determines "in light of the whole proceeding, whether the claimed error was sufficiently prejudicial" to deprive the defendant of a fair trial. State v. Ross, 2003 WI App 27, ¶47, 260 Wis. 2d 291, 659 N.W.2d 122; State v. Sigarroa, 2004 WI App 16, ¶24, 269 Wis. 2d 234, 674 N.W.2d 894. See also Ford, 306 Wis. 2d 1, ¶29; State v. Doss, 2008 WI 93, ¶¶69-71, 312 Wis. 2d 570, 754 N.W.2d 150. "An erroneous exercise of discretion may arise from an error in law or from the failure of the circuit court to base its decisions

---

[6] State v. Debrow, No. 2021AP1732-CR, ¶36.

9

on the facts in the record." State v. Raye, 2005 WI 68, ¶16, 281 Wis. 2d 339, 697 N.W.2d 407.

### B. Debrow's Motion for Mistrial

¶45 The Constitution does not guarantee an error-free trial, United States v. Hasting, 461 U.S. 499, 508-09 (1983), and not all errors warrant a mistrial. In order to preserve review of a claimed evidentiary error, the disadvantaged party must make a contemporaneous objection and move for a mistrial. State v. Guzman, 2001 WI App 54, ¶25, 241 Wis. 2d 310, 624 N.W.717. When improper evidence comes before the jury, the circuit court decides whether a curative instruction is necessary as part of the exercise of its discretion in ruling on a mistrial motion. Sigarroa, 269 Wis. 2d 234, ¶¶24-26. "[T]he law prefers less drastic alternatives [than mistrials], if available and practical." State v. Adams, 221 Wis. 2d 1, 17, 584 N.W.2d 695 (Ct. App. 1998).

¶46 Accordingly, I review whether the circuit court erroneously exercised its discretion in determining that Isaac's statement fell short of the high prejudicial bar to warrant a mistrial.[7] Sigarroa, 269 Wis. 2d 234, ¶27. As part of this review, I examine the sufficiency of the jury instructions relative to the objected-to testimony. Hardison v. State, 61 Wis. 2d 262, 273, 212 N.W.2d 103 (1973).

---

[7] Neither party argues that Isaac's statement rises to structural error; therefore, automatic reversal is not appropriate. State v. Ford, 2007 WI 138, ¶42, 306 Wis. 2d 1, 742 N.W.2d (quoting Neder v. United States, 527 U.S. 1, 8 (1999)).

10

¶47 We previously have explained that sound discretion includes "acting in a deliberate manner taking sufficient time" to respond to a request, giving both parties a "full opportunity" to argue their positions, and "considering alternatives such as a curative instruction or sanctioning counsel." State v. Seefeldt, 2003 WI 47, ¶36, 261 Wis. 2d 383, 661 N.W.2d 822. A court that "reason[s] its way to a rational conclusion" while considering the relevant law and facts exercises sound discretion. Id. See generally State v. Moeck, 2005 WI 57, ¶¶43, 72, 280 Wis. 2d 277, 695 N.W.2d 783. The question is not whether we would have reasoned identically to the circuit court, but rather, whether the court arrived at its conclusion "by the consideration of the relevant law, the facts, and a process of logical reasoning." Hartung v. Hartung, 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981).

¶48 Directly following Debrow's mistrial motion, both parties argued their positions at length outside the presence of the jury, with considerable counterargument from both sides. In short, both parties had a "full opportunity" to advance their arguments, and the court devoted sufficient time to the issue. It also weighed "less drastic" alternatives to address the "blurted out" and "stopped" statement. The court noted striking, which it had done, and a curative instruction were available alternatives.

¶49 The circuit court further reasoned there was no way to know whether any of the jurors were familiar with CCAP. A juror who was familiar with CCAP may have had familiarity due to small

11

claims, civil, divorce, or other court record, not necessarily a criminal conviction. In addition, Isaac's response was overridden by directing the jury's attention to hearsay concerns. All of those reasons "lessen[ed] the necessity of granting" Debrow's mistrial motion. Lastly, the circuit court stated it could not grant a mistrial for "that minimal bit of information" that the jury may have heard.

¶50 The court correctly noted that Isaac's interrupted testimony did not state anything about a prior criminal conviction, let alone a conviction for sexual assault of a child. Although Debrow argues the phrase "I looked on CCAP" leads to a string of inferences necessarily culminating in the most prejudicial assumption, we have said before that "this court cannot assume that more specific information of a prejudicial nature was involved." Johnson v. State, 75 Wis. 2d 344, 366, 249 N.W.2d 593 (1977). Instead, the focus must remain on whether the error was so prejudicial that the only remedy capable of addressing it is granting a mistrial. See generally Lobermeier v. Gen. Tel. Co. of Wis., 119 Wis. 2d 129, 136, 349 N.W.2d 466 (1984). See also McClinton v. State, 464 S.W.3d 913, 914 (Ark. 2015) ("Declaring a mistrial is proper only where the error is beyond repair and cannot be corrected by any curative relief."). Here, the court properly exercised its discretion by unpacking the string of potential inferences to conclude Isaac's comment was capable of remedy by less drastic means.

¶51 The circuit court appropriately, but narrowly, based its decision on the record before it. Factually, all we have

12

here is the statement, "I looked on CCAP." The court reporter did not capture this statement because of "[u]nreportable simultaneous interjections by Counsel." That is a far cry from disclosure that in 2004 Debrow was convicted of sexual assault of a child.

¶52 However, more analysis is needed because whether the circuit court appropriately exercised its discretion when denying a motion for mistrial includes assessing whether the circuit court gave reasoned consideration to the possibility of a curative instruction relative to the claimed error. State v. Williams, 2004 WI App 56, ¶31 n.3, 270 Wis. 2d 761, 677 N.W.2d 691. In Moeck, 280 Wis. 2d 277, we again addressed the importance of cures other than mistrial for errors during trial. We concluded that "the circuit court did not exercise sound discretion in declaring a mistrial when it failed to give adequate consideration to the State's ability to refer to the defendant's silence and to the effectiveness of a curative jury instruction." Id., ¶71.

¶53 In Debrow's trial, I conclude that review of the complained-of statement in the context of the whole proceeding confirms that the statement was not so prejudicial as to affect the fairness of his trial. One central question with mistrials "is to determine under the facts if the error is prejudicial . . . in light of the whole proceeding. If the evidence presented in a case was extremely weak and the same error occurred, it could justifiably be deemed grounds for a mistrial." Oseman v. State, 32 Wis. 2d 523, 528-29, 145 N.W.2d

13

766 (1966). See also Ford, 306 Wis. 2d 1, ¶50; Adams, 221 Wis. 2d at 17. Therefore, I consider the strength of the State's evidence against Debrow and the sufficiency of the instruction given to the jury that relates to Isaac's testimony.

¶54 Mary, Isaac, Nancy, and Kathy consistently testified that on the morning of January 17, 2018, Mary repeatedly screamed "get out," which caused the dogs to bark. Mary, Nancy, and Isaac all identified Debrow as in the girls' bedroom when that happened, and the sisters both explained how they knew the person in their room was Debrow. Testimony from officers and detectives who interviewed Mary as part of the investigation confirmed that Mary's account of Debrow's actions had been consistent.

¶55 The jury heard Mary testify that she woke to find Debrow in her room on a prior occasion, but that he told her "it's just a game, [so] you don't have to tell your mom." Mary did not tell Kathy. Mary and Kathy both testified that Kathy had instructed her daughters to scream if anything of concern were to happen in their bedroom. Kathy testified that there was a "rule" in the home prohibiting the girls and boys from entering one another's bedrooms.

¶56 The jury heard a phone recording in which Debrow told Kathy, "I got something in my mind that I need help," and in which Kathy confronted Debrow about a pornographic video he had watched, the graphic title of which implied a stepfather sexually abusing a stepdaughter while his wife was asleep. Jurors saw text messages about the same conversations.

14

¶57 An officer testified that Debrow specifically questioned the degree of sexual assault for which he was arrested——asking why it was second-degree and not fourth.

¶58 Jurors also heard impeachment evidence. For instance, they heard Mary and Isaac state they did not like Debrow. Isaac disclosed that he and Debrow had gotten into multiple physical altercations, and Kathy testified that she and Debrow got back together briefly some weeks after the January 2018 incident, although they were not together at the time of trial.

¶59 The circuit court offered to consider a specially drafted curative instruction that Debrow did not request when counsel and the court had their instructions conference. The court also offered standard Civil Jury Instruction 150, which was given and provided: "During the trial, the Court has ordered certain testimony to be stricken. Disregard all stricken testimony." This instruction directly addressed Isaac's testimony which was stricken as soon as it was given.

¶60 Last, the jury simultaneously convicted Debrow for assaulting Mary while it acquitted him of assaulting Nancy. Accordingly, when considered in the context of the "whole proceeding," it is "quite clear" that whatever prejudice the statement "I looked on CCAP" may have caused Debrow, it fell short of the high bar to warrant a mistrial. Oseman, 32 Wis. 2d at 529. "[N]o reasonable jury could have fairly come to any other decision." Id. at 530.

C. Court of Appeals Decision

15

¶61 The court of appeals concluded that the jury instruction was insufficient to ameliorate Isaac's statement and therefore Debrow was entitled to a new trial. See State v. Debrow, No. 2021AP1732-CR, unpublished slip op., ¶36 (Wis. Ct. App. July 21, 2022) ("The court's attempts to cure the prejudicial effect of this testimony were insufficient and did not properly instruct the jury to disregard that testimony when deliberating."). Debrow did request standard Civil Jury Instruction 150, which was given and focuses on Isaac's testimony because his statement was stricken immediately on Debrow's objection and motion for a mistrial. I conclude under the entire proceedings, Instruction 150 was sufficient.

### III. CONCLUSION

¶62 A jury convicted Debrow of second-degree sexual assault of a child under the age of 16 following a three-day trial. Debrow moved for a mistrial at the conclusion of the second witness's testimony, which the circuit court denied. I conclude that the circuit court did not erroneously exercise its discretion in denying Debrow's mistrial motion when reviewed in light of the entire trial, including the sufficiency of the jury instruction. Accordingly, I would reverse the court of appeals decision and conclude that Debrow is not entitled to a new trial.

¶63 I concur in the result reached by the majority opinion, but I do not join the opinion. It lacks a full analysis of the entire proceeding, which is necessary in addressing the court of appeals reversal of the circuit court.

¶64  I am authorized to state that Justice REBECCA GRASSL BRADLEY joins this concurrence.